UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**BONNIE BRUNNER and**
**DAVID BRUNNER,**

**Plaintiffs,**

**v.** **Case No. 24-C-719**

**JAMES F. KUBASTA and**
**BRENDA M. KUBASTA,**

**Defendants.**

---

**ORDER GRANTING DEFENDANT BRENDA M. KUBASTA'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs Bonnie and David Brunner brought this diversity action against Defendants Classic Homes by Kuba Ltd., James F. Kubasta, and Brenda M. Kubasta, alleging that Defendants engaged in a pattern of misconduct related to a home improvement project. The court has jurisdiction under 28 U.S.C. § 1332. The clerk entered default as to Classic Homes by Kuba, Ltd. on July 15, 2025, when it failed to conduct a defense due to the entity's inability to retain counsel. Dkt. No. 99. This matter comes before the court on Defendant Brenda M. Kubasta's motion for summary judgment. Dkt. No. 76. For the following reasons, Ms. McCarty-Kubasta's motion for summary judgment is granted.

**BACKGROUND**

Ms. McCarty-Kubasta married co-Defendant Mr. Kubasta in 2006 and the two lived together in Winneconne, Wisconsin. Dkt. No. 127, ¶¶ 1, 3. They owned and rented out several duplexes in Omro, Wisconsin together, which they sold in 2023. *Id.* at ¶ 18. Aside from this duplex, the Kubastas kept several of their assets separate throughout their marriage. Ms. McCarty-

Kubasta took out the mortgage on their home in her name alone and was the only person who made payments on the mortgage. *Id.* at ¶ 4–5. They also owned and operated separate businesses. Ms. McCarty-Kubasta owned and operated Oshkosh Floor Designs Acquisition LLC (Oshkosh Floor Designs), a flooring business which she sold in 2021, as well as BMK Real Estate Holdings, LLC (BMK Real Estate), a real estate holding business. *Id.* at ¶¶ 6–11. Mr. Kubasta owned and operated Classic Homes by Kuba, LLC (Classic Homes), a home carpentry business. *Id.* at ¶ 13. Classic Homes also went by the name Kuba Design Builders. *Id.* at ¶ 35. From all appearances, Ms. McCarty-Kubasta's businesses were successful; Mr. Kubasta's business was not.

Ms. McCarty-Kubasta had, and still has, no ownership interest in Classic Homes. *Id.* at ¶ 17. She also never served as an officer or director of the business. *Id.* at ¶ 15. The parties otherwise dispute Ms. McCarty-Kubasta's role in Classic Homes'. Plaintiffs believe Ms. McCarty-Kubasta served as an agent of Classic Homes and had authority over Classic Homes' bank account. *Id.* at ¶¶ 15–16. Ms. McCarty-Kubasta, on the other hand, claims she was not an agent of the business and had no authority over its finances. *Id.* This disagreement is due to their differing interpretations of Ms. McCarty-Kubasta's operational and financial involvement with Classic Homes and Mr. Kubasta.

It is undisputed that Ms. McCarty-Kubasta had some operational involvement with Classic Homes. She assisted with projects, picked up materials from suppliers, and made the BMK Real Estate office available to Classic Homes to use in various ways. Dkt. No. 131, ¶¶ 46, 48, 49.

Her financial involvement is more complex. Beginning in 2020, Classic Homes began experiencing financial troubles. *Id.* at ¶ 1. During this time, Ms. McCarty-Kubasta and her businesses transferred funds to Mr. Kubasta and his businesses. On several other occasions, funds were transferred to Ms. McCarty-Kubasta from Mr. Kubasta or Classic Homes, but for discernable

economic reasons. On April 24, 2020, for example, Kuba Design Builders, as part of Classic Homes, transferred via check $8,000.00 to BMK Real Estate. Dkt. No. 127, ¶ 39. This was a return of funds after BMK Real Estate decided it no longer wanted to proceed with work it had hired Kuba Design Builders to perform. *Id.* at ¶ 41. On October 21, 2020, Kuba Design Builders paid by check $8,250.00 to Ms. McCarty-Kubasta for the purchase of excess flooring. *Id.* at ¶¶ 43–44. On November 15, 2021, Kuba Design Builders paid BMK Real Estate $26,750.00 in the form of a check, again as a return of funds after BMK Real Estate decided it no longer wanted to proceed with work it had hired Kuba Design Builders to complete

. *Id.* at ¶¶ 45–46; *see also* Dkt. No. 131, ¶ 15. On June 23, 2023, Mr. Kubasta paid Ms. McCarty-Kubasta $4,000.00 by check, which served as repayment of a loan she had made to Mr. Kubasta. Dkt. No 127, ¶¶ 48–49. On November 6, 2023, Kuba Design Builders paid Ms. McCarty-Kubasta $50,000. *Id.* at ¶ 51. This payment was made after they sold one of the duplexes they owned together for approximately $100,000, *id.* at ¶ 53, and Ms. McCarty-Kubasta claims that the $50,000 was for her time and effort in "flipping" the duplex for sale. *Id.* at ¶¶ 21, 57. For only one payment is no explanation provided: on December 30, 2023, Kuba Design Builders paid Ms. McCarty-Kubasta $1,602.63 by check, and the parties provide no reason for this payment. *Id.* at ¶ 62.

In other instances, Ms. McCarty-Kubasta transferred money to Mr. Kubasta or one of his businesses in an apparent effort to help him succeed. *Id.* at ¶¶ 65, 67. In December 2021, BMK Real Estate made a payment to Classic Homes in the amount of $24,623.00. Dkt. No. 131, ¶ 16. In November 2022, Ms. McCarty-Kubasta wrote a check to Mr. Kubasta for $20,000 from her personal bank account. *Id.* at ¶ 17. On June 11, 2023, she again paid Mr. Kubasta $50,000.00 by check. *Id.* at ¶ 18. On September 6, 2023, Ms. McCarty-Kubasta paid Noffke Lumber

$100,000.00 to pay off Classic Homes' debt, and she did the same on October 27, 2023 in the amount of $146,088.39. *Id.* at ¶ 22, 26. Ms. McCarty-Kubasta made both payments because the owner of Noffke Lumber reached out to her directly regarding Classic Homes' debt. *Id.* at ¶ 28. On May 10, 2024, Ms. McCarty-Kubasta withdrew $15,000 from her personal account, and that money was deposited into the account for Classic Homes. Dkt. No. 127, ¶¶ 36–38. On June 6, 2024, she transferred another $100,000.00 to Mr. Kubasta. Dkt. No. 131 at ¶ 36. In many instances, she does not remember what these payments were for. *Id.* at ¶¶ 16, 17, 20, 34, 37. And although Mr. Kubasta often promised to repay Ms. McCarty-Kubasta, he ultimately only wrote her one $4,000.00 check toward that end. *Id.* at ¶¶ 19, 21, 23, 25, 27, 31, 35, 38. As a whole, Classic Homes relied on hundreds of thousands of dollars from Ms. McCarty-Kubasta to pay day-to-day expenses and project debts. *Id.* at ¶ 13.

The events that led to this lawsuit began in 2023. Plaintiffs purchased property in Winneconne, Wisconsin in the summer of 2023. Dkt. No. 127, ¶ 26. In mid-July 2023, Mr. Kubasta approached Plaintiffs to inquire about remodeling their property. Dkt. No. 131, ¶ 4. Two months later, on September 6, 2023, Plaintiffs entered a contract with Classic Homes for the renovation of their property. *Id.* at ¶ 6. The contract called for performance of the contract for payment of $600,000.00, with $25,000.00 to be paid as earnest money and the remainder to be paid over the course of eight draws and a final payment. Dkt. No. 128-3 at 2–3. Mr. Kubasta was the contractor of the project, and neither party disputes that Ms. McCarty-Kubasta was not a contractor—either prime or subcontractor—on Plaintiffs' project. Dkt. No. 127*,* ¶ 29.

Classic Homes began working on the project and Plaintiffs paid $383,594.00 in response to five draw requests, with the first payment being made in September 2023. *Id.* at ¶ 27; Dkt. No. 131 at ¶ 9. By the time of the sixth draw request, Plaintiffs claim that they refused to pay Classic

Homes because the renovation was not proceeding in accordance with the contract. Dkt. No. 131 at ¶¶ 10–11. Plaintiffs state they later found out that, at the time of contracting, Mr. Kubasta did not intend to use Plaintiffs' payments solely for the renovation of their property. *Id.* at ¶¶ 8, 11. Mr. Kubasta later admitted to using Plaintiffs' payments for day-to-day expenses of Classic Homes, to pay off other project debts, and to settle a lawsuit involving himself and Ms. McCarty-Kubasta. *Id.* at ¶ 12.

As for Ms. McCarty-Kubasta, the parties agree that she never directly received funds from Plaintiffs. Dkt. No. 127 at ¶ 70. However, Plaintiffs dispute whether she ever received funds from the project indirectly, due to the financial commingling between the Kubastas and their businesses and the settlement of the lawsuit that she was involved in. *Id.* at ¶¶ 30, 70. The parties also agree that she was involved with the Brunner project on only two occasions. The first was to accept a shipment of furniture that was sent to her warehouse. *Id.* at ¶ 31; Dkt. No. 131 at ¶¶ 39–40. The second was asking a flooring delivery driver if they would place Plaintiffs' flooring in their garage instead of outside to avoid the flooring being damaged by rain or weather. Dkt. No 127 at ¶ 31; Dkt. No. 131 at ¶ 43.

Amidst the business transaction that is the subject of this lawsuit, two significant events occurred. The first is the settlement of a lawsuit naming both Mr. Kubasta and Ms. McCarty-Kubasta as defendants. The lawsuit was brought by a prior customer of Classic Homes. Dkt. No. 131 at ¶ 58. Mr. Kubasta admitted to using approximately $20,000.00 of Plaintiffs' funds to settle and dismiss the lawsuit. *Id.* at ¶¶ 12, 60. There is no evidence that Ms. McCarty-Kubasta was involved in the decision to use Plaintiffs' funds to settle the lawsuit.

The second significant event is Ms. McCarty-Kubasta's divorce from Mr. Kubasta. She claims that her reason for seeking the divorce is that she could not trust Mr. Kubasta, while Mr.

Kubasta has stated that the divorce was a "sham" to shield their assets from creditors. Dkt. No. 127 at ¶¶ 22–24; Dkt. No. 131 at ¶¶ 50–55. Regardless of the reason, Ms. McCarty-Kubasta sought advice from an attorney in the fall of 2023, and the divorce was finalized in September 2024. Dkt. No 127 at ¶¶ 24–25. The divorce judgment ordered that Mr. Kubasta retain all of his assets, Classic Homes, and Classic Homes' assets. *Id.* at ¶ 25. Ms. McCarty-Kubasta retained the home that she held the mortgage on, her assets, and BMK Real Estate and its assets. *Id.* Even after the divorce, however, the Kubastas remained in frequent contact. Dkt. No. 131 at ¶ 56.

Plaintiffs filed this lawsuit in June of 2024, asserting claims of theft by contractor, voidable transfer, conversion, and civil conspiracy against Ms. McCarty-Kubasta. Compl., Dkt. No. 1. Ms. McCarty-Kubasta filed a motion for summary judgment on April 7, 2025. Dkt. No. 76. The court stayed the case for a period of time so as not to interfere with ongoing criminal proceedings, during which the motion for summary judgment remained pending. The motion is now fully briefed, and the court addresses the motion below.

## LEGAL STANDARD

Summary judgment is proper when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted). The party opposing the motion for summary judgment must "submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the

material facts." *Id.* Stated differently, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999); *see also Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) ("The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal."). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322).

**ANALYSIS**

At base, the parties dispute Ms. McCarty-Kubasta's involvement in Mr. Kubasta's alleged misconduct. Ms. McCarty-Kubasta states that she "had no role in the dealings between the Brunners and Mr. Kubasta." Def.'s Br. at 3, Dkt. No. 77. Plaintiffs, on the other hand, assert that Ms. McCarty-Kubasta "played an active and vital role . . . in furtherance of Classic Homes' defrauding of Plaintiffs and theft of their money." Pls.' Br. at 1–2, Dkt. No. 125.

As a preliminary matter, the court notes that Plaintiffs fail to adequately support many of the key facts they allege or dispute with citations to the record. For example, in response to the proposed finding of fact stating that "Ms. McCarty-Kubasta has never met the Brunners and took no part in any of these discussions," Plaintiffs respond, "[d]isputed to the extent that 'these discussions' are undefined." Dkt. No. 127, ¶ 28. They do not provide any affirmative evidence that she did, in fact, meet the Brunners or have a discussion with them. Ms. McCarty-Kubasta also submitted a proposed finding of fact stating that she "received no funds from the Brunners for their project," to which Plaintiffs respond, "[d]isputed." *Id.* at ¶ 30. They provided the same response

to the proposed finding of fact that "Ms. McCarty-Kubasta has and had no authority over Classic Homes' bank accounts." *Id.* at ¶ 16. None of the responses include citations to facts in the record. *See* Civil L.R. 56(b)(2)(B) ("[A] concise response to the moving party's statement of facts that must contain . . . in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon."). In their own submissions, Plaintiffs do not provide any record citations for their proposed facts related to the lawsuit settlement involving Ms. McCarty-Kubasta. *See* Dkt. No. 131 ¶¶ 60–61. To the extent Plaintiffs have failed to provide citations to the record, their responses to Ms. McCarty-Kubasta's Proposed Findings of Fact, as well as their own Statement of Additional Facts, will be disregarded. Keeping this in mind, to determine whether a genuine issue of material fact exists, the court will consider each claim brought against Ms. McCarty-Kubasta in turn.

**A. Theft by Contractor**

Plaintiffs allege Defendant Ms. McCarty-Kubasta committed theft by contractor in violation of Wis. Stat. § 779.02(5). That statute states in relevant part:

> **(5)** Theft by contractors. . . . [A]ll moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated . . . . If the prime contractor or subcontractor is a corporation, limited liability company, or other legal entity other than a sole proprietorship, such misappropriation also shall be deemed theft by any officers, directors, members, partners, or agents responsible for the misappropriation. . . . Except as provided in this subsection, this section does not

> create a civil cause of action against any person other than the prime contractor or subcontractor to whom such moneys are paid.

The statute imposes a trust on the funds a contractor receives from the owner of a property and requires that those funds be used only to pay for "labor, services, materials, plans, and specifications used" in performing the construction contract. "Using the funds for some . . . purpose [other than services, materials, plans and specifications used for the improvements]—whether personal or corporate—violates the statute, and the officers, [directors, members, partners, or agents] of the corporation may be held personally liable." *St. Croix Reg'l Med. Ctr. v. Keller*, 884 N.W.2d. 534, at *4–5 (Wis. Ct. App. 2016) (quoting *Cap. City Sheet Metal, Inc. v. Voytovich*, 578 N.W.2d 643, 645–646 (Wis. Ct. App. 1998)).

The parties do not dispute that Ms. McCarty-Kubasta was neither a prime or subcontractor on the project, nor an officer or director of Classic Homes. Dkt. No. 127, ¶¶ 15, 29. Thus, the only route to liability for Ms. McCarty-Kubasta is if she was acting as an agent of Classic Homes. By the terms of the civil theft by contractor statute, to hold the agent of a company liable a plaintiff must prove: (1) a legal entity served as a prime or subcontractor for an improvement project; (2) the owner of the property paid the entity for improvements (the trust funds); (3) the entity used the trust funds to pay for something other than labor, services, materials, plans, and specifications for the improvement project (the misappropriation); (4) defendant was an agent of the entity; and (5) as an agent of the entity, defendant was responsible for the misappropriation of trust funds. Here, the parties do not dispute the first three elements—Classic Homes, an S corporation, served as the prime contractor for the improvement project, Plaintiffs paid Classic Homes for the project, and the trust funds were used to pay unrelated business expenses and other project debts. Dkt. No. 127, ¶ 71; Dkt. No. 131, ¶¶ 6, 9, 12. The focus here is the fourth and fifth elements—whether Ms. McCarty-Kubasta was an agent of Classic Homes and whether she was responsible for the

misappropriation. Because a discussion of the fifth element resolves this motion, the court declines to address whether Ms. McCarty-Kubasta was an agent of Classic Homes.

As to the fifth element, "[a] corporate agent may be responsible for theft by contractor if he allows the corporate trust funds to be spent contrary to the statute." *In re Thompson*, 2026 WL 2682357, at *25 (Bankr. W.D. Wis. Sept. 11, 2026) (citing *Capen Wholesale, Inc. v. Probst*, 509 N.W.2d 120, 124 (Wis. Ct. App. 1993)). Whether an individual receives a personal benefit is irrelevant in determining responsibility. "The only important point is that [the funds received by the contractor] were used for purposes other than the payment of claims as provided in the statute." *Burmeister Woodwork Co. v. Friedel*, 222 N.W.2d 647, 650 (1974).

*In re Thompson* is instructive on this element. In that case, a contractor—12 Gauge Construction, LLC—was seeking a declaration that a debt held by Thompson Exteriors, LLC was nondischargeable in bankruptcy, alleging that the underlying debt was subject to a theft by contractor claim. 2026 WL 2682357, at *1. By way of background, Aron Thompson owned and operated Thompson Exteriors, LLC. *Id.* Thompson Exteriors contracted with 12 Gauge to provide rough carpentry for an apartment building. *Id.* The contract was ultimately terminated and 12 Gauge sued, alleging that both Aron Thompson and his wife Nicole were liable under Wisconsin's theft by contractor statute. *Id.* In reaching its conclusion, the court explained how both Aron and Nicole were "responsible for the misappropriation." As for Aron, the court found that as the sole member of Thompson Exteriors, he was necessarily responsible. *Id.* at *25. Additionally, the court found that Nicole was responsible due to her operational and financial involvement with the business. She assisted with Thompson Exterior's operations by communicating with other contractors, indicating that she was the "Business Manager," joining a video conference meeting, and preparing payment applications. *Id.* at *2–3, 26. She was also involved with the business's

finances, serving as an authorized signatory on the Thompson Exteriors account, holding both debit and credit cards in the business's name, and writing checks and signing lien waivers on Thompson Exterior's behalf. *Id.* at *26. Given Nicole's "significant role in the business," the court found her responsible for the misappropriation. *Id.* at *27.

Here, Ms. McCarty-Kubasta argues Plaintiffs have produced no evidence to show responsibility. She states that she had no control over the Classic Homes bank account and did not receive Plaintiffs' money (the trust funds). Def.'s Br. at 22. Though both of these facts are disputed by Plaintiffs, they offer no citations to any evidence that shows such a dispute. Dkt. No. 127, ¶¶ 16, 30. Plaintiffs contend that Ms. McCarty-Kubasta did not need to personally benefit from the trust funds to be responsible for the misappropriation, but even so, Plaintiffs argue, Ms. McCarty-Kubasta did personally benefit from the misappropriation because the funds were used to settle and dismiss a lawsuit to which she was a named defendant. Pls.' Br. at 15–16. In her reply, Ms. McCarty-Kubasta asserts that cases explaining that a defendant need not personally benefit from the misappropriation, as well as the evidence regarding settlement of another lawsuit, do not create a triable theft by contractor claim. Those facts, she argues, are only relevant to an alleged benefit or lack thereof—they do not address the question of whether Ms. McCarty-Kubasta is responsible for the misappropriation in the first place. Def.'s Reply Br. at 8–9.

This case is similar to *In re Thompson*, but the involvement of Ms. McCarty-Kubasta is significantly less than that which existed there. Mr. Kubasta was the owner and operator of Classic Homes, and it appears no party disputes whether he is responsible for the misappropriation. *See* Dkt. 127, ¶ 13. Ms. McCarty-Kubasta, on the other hand, was not significantly involved with Classic Homes. Although she was involved with Classic Homes operations, the involvement was minimal, such as picking up materials or assisting with tasks like painting or cleaning up. Dkt.

No. 128-21, ¶ 14. Ms. McCarty-Kubasta never spoke to Plaintiffs about their construction project, and she had no part in the contract or renovations. Dkt. No. 79, ¶ 16. As for her financial involvement, Ms. McCarty-Kubasta did not have access to or control over the Classic Homes bank account, nor did she write checks or sign documents on Classic Homes' behalf. *Id.* at ¶ 8. She also did not collect or receive funds from Plaintiffs for their construction project. *Id.* at ¶ 16. [1] True, she loaned a significant amount of money to Classic Homes and paid off Classic Homes' debt, but each of these decisions dealt with her own finances rather than the finances of Classic Homes. The evidence of Ms. McCarty-Kubasta's involvement with Classic Homes shows that she tried to keep her husband's business afloat. It is not enough for a reasonable jury to conclude that she was responsible for the misappropriation of Plaintiffs' funds.

Plaintiffs also place significant weight on the settlement of another lawsuit using their funds, which benefited Ms. McCarty-Kubasta because she was named as a defendant in that suit. The evidence in the record, however, only points to Mr. Kubasta using Plaintiffs' funds to settle and dismiss that suit. The lawsuit was brought by All-Ways Concrete, LLC, against Mr. Kubasta, his company, as well as Ms. McCarty-Kubasta, for Mr. Kubasta's failure to pay an amount due on one of his projects. Dkt. No. 128-25 at 91–93. There is no evidence that Ms. McCarty-Kubasta had any involvement in the project, so it is not even clear why she was sued. In any event, an incidental benefit to Ms. McCarty-Kubasta does not in itself show that she was responsible for any misappropriation. In short, Plaintiffs have not made a showing to establish an essential element of a theft by contractor claim: that Ms. McCarty-Kubasta was responsible for the misappropriation. Summary judgment on this claim is therefore appropriate.

---

[1] Although Plaintiffs again dispute some of these facts, they provide no evidentiary support for their disagreement. As stated above, the party opposing the motion for summary judgment must "submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted).

**B. Conversion**

Plaintiffs claim Ms. McCarty-Kubasta committed conversion. Under Wisconsin law, the elements of conversion are: "(1) intentional control or taking of property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the rights of the owner to possess the property." *H.A. Friend & Co. v. Pro. Stationery, Inc.*, 720 N.W.2d 96, 100 (Wis. Ct. App. 2006). A plaintiff bringing a conversion claim "must either be in possession of the property or entitled to immediate possession at the time of the conversion." *Boyland Auto Grp. III LLC v. Boyland*, 2025 WL 1467743, at *2 (E.D. Wis. May 22, 2025) (citing *Prod. Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 261 N.W.2d 127, 129 (Wis. 1978)).

Plaintiffs' conversion claim rests on the frequent transfers of money between the Kubastas. Ms. McCarty-Kubasta challenges Plaintiffs' conversion claim against her on several grounds. First, she argues that many of the transfers from Mr. Kubasta or Classic Homes to her or her businesses occurred prior to when Plaintiffs' project began and thus cannot constitute converted funds. At that point in time, she reasonably notes, "[t]here was no property to convert." Def.'s Br. at 16. She argues that the remaining transfers, which took place after Plaintiffs had paid money to Classic Homes, could not be the basis of a conversion claim because the Classic Homes bank account was depleted of Plaintiffs' funds before any payment was made to Ms. McCarty-Kubasta or one of her businesses. *Id.* at 16–17. Plaintiffs respond that "possession [of their funds] by Mr. Kubasta and Classic Homes is tantamount to possession by Ms. McCarty-Kubasta and her companies." Pls.' Br. at 19. Thus, Mr. Kubasta's admission that the money from one of Plaintiffs' draws was used to fund a litigation settlement involving Ms. McCarty-Kubasta is enough to survive summary judgment on the conversion claim. *Id.* In her reply, Ms. McCarty-Kubasta argues that the law does not permit treating Mr. Kubasta's possession of Plaintiffs' property as

Ms. McCarty-Kubasta's possession of the same. Def.'s Reply Br. at 9–10. She also asserts that the fact she might have benefited from Mr. Kubasta's conversion of Plaintiffs' property is not enough to establish a conversion claim against her. *Id.* Conversion, in her view, is defendant specific—it requires taking or control of property by Ms. McCarty-Kubasta herself.

The conversion claim against Ms. McCarty-Kubasta fails on the first element—intentional taking or control of the property of another. Plaintiffs have offered no evidence from which a reasonable jury could find that Ms. McCarty-Kubasta intentionally took or controlled Plaintiffs' property. First, although Plaintiffs present evidence that Mr. Kubasta admitted to using Plaintiffs' funds for Classic Homes' day-to-day expenses, for paying off other project debts, and for paying a $20,000.00 judgment, Dkt. No. 131 at ¶ 12, this evidence does not establish that Ms. McCarty-Kubasta participated in or committed these acts. *See Tikalsky v. Friedman*, 928 N.W.2d 502, 520 (2019) (quoting *Lewis v. Physicians Ins. Co. of Wis.*, 627 N.W.2d 484, 488 (2001)) ("It is a basic principle of law, as well as common sense, that one is typically liable only for his or her own acts, not the acts of others.").

Second, Plaintiffs assert that Mr. Kubasta was motivated to divorce Ms. McCarty-Kubasta so their assets could be transferred to Ms. McCarty-Kubasta in the face of his liabilities. But Ms. McCarty-Kubasta disputes that this is the reason for the divorce; she asserts she pursued the divorce because she did not trust him. Dkt. No. 131, ¶¶ 52–55. Even accepting Mr. Kubasta's reason for the divorce, there is nothing improper or illegal for a person to obtain a divorce to protect their own assets and credit from debt incurred by an irresponsible spouse. Indeed, the record reveals that Mr. Kubasta retained his assets and the assets of his businesses, and Ms. McCarty-Kubasta retained her assets and those of her business. Dkt. No. 127, ¶ 25. In short, Plaintiffs have

failed to demonstrate that Ms. McCarty-Kubasta ever controlled or took Plaintiffs' property as a result of the divorce.

Third, Plaintiffs point to evidence related to the financial interactions between Defendants, including that money flowed from Ms. McCarty-Kubasta and her businesses to Mr. Kubasta and his businesses or their debtors. Dkt. No. 131 at ¶ 15–38. There is also evidence that Classic Homes or Mr. Kubasta transferred money to Ms. McCarty-Kubasta or her businesses. But Plaintiffs present no evidence that Ms. McCarty-Kubasta received any of Plaintiffs' funds as a result of these transfers. Nor is there evidence that funds were transferred to Ms. McCarty-Kubasta without consideration. None of this evidence shows that Ms. McCarty-Kubasta controlled or took the property of *another*, namely the Plaintiffs, as required for a conversion claim.

Finally, Plaintiffs assert that Ms. McCarty-Kubasta has received funds or the benefit of said funds from construction draws. To support their assertion, Plaintiffs again cite the lawsuit where Mr. Kubasta and Ms. McCarty-Kubasta were named as defendants, and Plaintiffs' funds to Classic Homes that were used to obtain a release and dismissal of that lawsuit. Dkt. 131, ¶ 60. But as noted above, Plaintiffs provide no evidence to support this assertion, and Ms. McCarty-Kubasta denies the allegation, at least as applied to her. *Id.*

In sum, Plaintiffs offer nothing but their own belief to support their claim that Ms. McCarty-Kubasta converted their property. Such speculation is insufficient to allow a jury to find in their favor. *See Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment." (citation omitted)). For these reasons, Ms. McCarty-Kubasta's motion for summary judgment will be granted on the conversion claim.

### C. Voidable Transfer

Plaintiffs also allege that Ms. McCarty-Kubasta engaged in a voidable transfer in violation of Wis. Stat. § 242.04. A voidable transfer claim requires proof of the following elements: (1) that the plaintiff has a right to payment from the debtor; (2) that the debtor made a transfer to the defendant; and (3) that the debtor made the transfer with the intent to hinder, delay, or defraud one or more of its creditors. WIS JI–CIVIL 2792A. Here, the debtor is either Classic Homes or Mr. Kubasta, and Plaintiffs allege that he transferred money to Ms. McCarty-Kubasta in violation of the statute.

Ms. McCarty-Kubasta argues that, like the conversion claim, the lack of evidence that she received any of Plaintiffs' funds requires that summary judgment be granted in her favor on this claim. Because an essential element of a voidable transfer claim is a transfer made by the debtor and there is no evidence of such a transfer here, Ms. McCarty-Kubasta asserts that the claim against her fails. Def.'s Br. at 18. Plaintiffs argue that the evidence of Mr. Kubasta using Plaintiffs' funds to resolve the lawsuit involving Ms. McCarty-Kubasta is enough to show a transfer of funds in violation of the statute. Pls.' Br. at 19. They also argue that the intent necessary for a voidable transfer claim can be inferred because Ms. McCarty-Kubasta was an "insider" and she and Mr. Kubasta acted "in concert" to obtain a sham divorce. *Id.*

This claim suffers from the same shortcoming as the conversion claim—there is no evidence that either Classic Homes or Mr. Kubasta transferred money to Ms. McCarty-Kubasta with the intent to defraud the Plaintiffs. The only evidence of a transfer that Plaintiffs assert in their brief is evidence regarding the lawsuit being resolved with funds from the Brunners. But again, Plaintiffs provide no evidence to support this assertion, especially regarding Ms. McCarty-Kubasta's involvement in the settlement. From all appearances, Mr. Kubasta or his company were

the only liable parties. Mr. Kubasta using Plaintiffs' funds to settle the lawsuit against him in a way that incidentally benefits Ms. McCarty-Kubasta is not the same as him transferring those funds to her. Absent any evidence of a transfer, Plaintiffs' voidable transfer claim against Ms. McCarty-Kubasta must be dismissed.

**D. Civil Conspiracy**

Under Wisconsin law, "civil conspiracy is not a separate cause of action, but rather a theory of liability." *Ferris v. Location 3 Corp.*, 804 N.W.2d 822, 826 (Wis. Ct. App. 2011) (citation omitted). "A civil conspiracy claim has three elements: (1) the formation and operation of a conspiracy; (2) a wrongful act or acts done pursuant to the conspiracy; and (3) damage resulting from the act or acts." *N. Highland Inc. v. Jefferson Mach. & Tool Inc.*, 898 N.W.2d 741, (2017) (citation omitted). Here, Plaintiffs cannot show a wrongful act or acts done pursuant to the conspiracy, as no other claim against Ms. McCarty-Kubasta survives her motion for summary judgment. Therefore, summary judgment must be granted on the conspiracy claim as well.

## CONCLUSION

For the above reasons, Defendant Brenda M. Kubasta's motion for summary judgment (Dkt. No. 76) is **GRANTED**.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of September, 2026.

William C. Griesbach
United States District Judge